Agnes, Peter W., J.
1. Introduction
The defendant is charged with three counts of Trafficking in Cocaine, a class B Controlled Substance, one count of Conspiracy to Violate the Controlled Substances Law, and two counts of committing the Trafficking Violations within a School Zone. The defendant has filed a pretrial motion to suppress evidence seized from the third floor of 30 Grand Street, Worcester, Massachusetts on grounds that the police lacked probable cause, and that, even if there was probable cause, the search exceeded the scope of a warrant that had been issued for the second floor of the same address and was not otherwise justified. With the agreement of the parties, the court held an evidentiary hearing and heard testimony from Worcester Police Officer Stephen Cortis concerning the manner of the execution of the search warrant and the circumstances surrounding the seizure of drugs at 30 Grand Street. Based on the credible evidence presented at that hearing, I make the following findings of fact.
2. Facts. (A) Execution of the Search Warrant
Officer Stephen Cortis is a member of the Worcester Police Vice Squad and is one of the officers who handle the department’s narcotics detection dogs. He participated in the execution of a search warrant at 30 Grand Street in Worcester on September 13,2006. The warrant, which is part of the record before the court, authorized the police to search “30 Grand St., second floor, Worcester, Ma. This location is a gray, three-family, with the number 30 clearly marked on the front of the building. To include hallways, porches, and storage for this apartment.” The objects to be seized under *294 the warrant Included quantities of cocaine, drug paraphernalia, records and money as more specifically described in the warrant. Officer Cortis was directed to the second floor of 30 Grandview with his canine. The apartment looked like someone was preparing to move into it. The canine did not alert to anything in the second-floor apartment. Officer Cortis and his canine were then directed to exit from the apartment through a back door and enter a hallway. They were told by other officers to enter the third-floor area. They did so by passing through a doorway, up a flight of stairs and into the third-floor attic area. The area was covered with insulation over which some ceiling tiles had been placed to allow people to walk from one place to another without stepping on the insulation. Officer Cortis released the canine who altered at a particular location. In keeping with the practice established for retrieval of evidence discovered by a canine, officer Cortis removed the canine from the area. Other police officers then recovered a large quantity of cocaine (approximately 520 grams) hidden under the insulation at the spot where the dog alerted.
3. (B) Contents of the Affidavit in Support of the Search Warrant
The defendant maintains that the police lacked probable cause to obtain the search warrant. Confining our inquiry to the affidavit in support of the warrant and the reasonable inferences that may be drawn from it, it appears that the affiant, Worcester Police Officer Martin O’Malley, is an experienced narcotics investigator who relied on information supplied by two confidential informants (“Cl”). The first Cl (“CI#1”) is a person known to Officer O’Malley who has given him information in the past that led to the arrest, prosecution and conviction of two named individuals in 2003 for drug offenses. In August 2006, CI#1 told the affiant that CI#1 has been buying drugs from a Hispanic male known as Juan Pena who drives a blue Toyota. According to a second Worcester Police Officer, Richard Burgos, Pena has been the subject of a prior Worcester police investigation involving controlled buys. That investigation led to the execution of a search warrant at 17IB Mill Street where Pena and his wife were then living. Officer Burgos also received information from a confidential informant (“CI#2”) who in the past provided information to officer Burgos which led to the location and deportation of a federal fugitive from justice. CI#2 also was familiar with Pena and said he had also purchased drugs from him. CI#2 told Burgos that Pena was operating out of a second-floor apartment at 17 Cheever Street in Worcester. CI#2 told officer Burgos that he/she had been inside the apartment within the past 30 days and had observed a large amount of cocaine there.
4.
Officer O’Malley also states in his affidavit that Cl# 1 made a controlled buy of narcotics from Pena on August 16, 2006. Pena drove to the meet in a blue Toyota (Mass. Reg. 17JK64) and was followed back to Cheever Street, but police were not able to pinpoint the specific address. The license plate on the Toyota was associated with a 1993 Oldsmobile registered to Juan Pena (DOB 6/24/64) at 17IB Mill Street, Worcester. On August 30, 2006, police arranged for a second controlled buy from Pena utilizing an undercover police officer. Pena was observed driving the Oldsmobile from 17 Cheever Street to the meet. A third controlled buy involving a different undercover officer was arranged for September 6, 2006. Pena was observed leaving 17 Cheever Street. He drove the Oldsmobile to an unknown address on Grand Street. Pena entered the location and shortly thereafter emerged with a second Hispanic male. The pair entered a silver Honda vehicle (Mass. Reg. 11BE02). The pair drove to the designated meet location where the undercover officer purchased a quantity of cocaine from Pena. The pair drove back to Grand Street. Pena then drove back to 17 Cheever in his Oldsmobile. Officer O’Malley also learned and stated in his affidavit that the electricity for the second-floor apartment at 17 Cheever Street is in the name of a female who had been living with Pena and who was present during the execution of the earlier search warrant at 17 IB Mill Street.
5.
Officer O’Malley also states in his affidavit that CI#2 told officer Burgos that within the past several days before September 12th, CI#2 overheard a conversation between Pena and a Hispanic male who was making drug deliveries for him, in which the unidentified male stated “he is using a vacant apt that he is remodeling as a secondary stash location to store and prepare Pena’s drugs for delivery.” Affidavit of Officer O’Malley at 4. Surveillance police officers made observations during the undercover drug purchase on September 6th that the driver of the silver Honda automobile entered the home located at 30 Grand Street following the drug buy. The Honda in question is registered to Joel Rios (DOB8/27/71) of820 Main Street in Worcester. The police obtained a photograph of Joel Rios which was identified by the CI#2 and the undercover officer as pictures of the person who accompanied Pena to the previous drug purchases.
6.
Officer O’Malley further states that an additional undercover drug purchase was arranged with Pena on September 12th. Pena told the undercover officer that the delivery would be made by one of his associates who would be driving a silver Honda automobile. The deal was consummated as planned with the delivery made by Rios. Surveillance officers observed Rios exit the front door of 30 Grand Street, enter the same silver Honda that was previously observed by the police, and drive to the meet location. Police surveillance of 30 Grand Street revealed it to be a three-family building with gray siding and the number 30 marked clearly on *295 the outside. A “for rent” sign appeared outside. The first floor appeared occupied, while the second-and third-floor apartments were vacant. Information supplied by the utility company indicated that there is but slight electric usage on the second floor (consistent with use of a tool or a light, but not enough to support someone living there), with no usage of electricity at all on the third floor.
7. Rulings of Law
(A) Probable Cause
The affidavit submitted by officer Martin O’Malley relies on a combination of first-hand knowledge gained by the police investigation and information supplied by confidential informants. In the case of the informants, in order for the court to credit the information they supplied to the police, the affidavit must demonstrate some of the underlying circumstances which indicate that it was (1) based on their own personal knowledge (basis of knowledge prong) and (2) that the informants are reliable reporters (veracity prong). Commonwealth v. Upton, 394 Mass. 363, 374-75 (1985). Here, the affiant demonstrated that each of the confidential informants was a reliable reporter. CI#1 had previously given information to the police that resulted in the prosecution and conviction of named individuals. See Commonwealth v. Byfield, 413 Mass. 426, 431 (1992). CI#2 provided information to the police that led officer Burgos to the location and deportation of a federal fugitive from justice. See Commonwealth v. Valdez, 402 Mass. 65, 71 (1988); Commonwealth v. Saleh, 396 Mass., 406, 410 (1985). In addition, the police investigation in this case, including in particular the observations of controlled deliveries of narcotics on August 30, September 6th, and September 12th corroborated the information supplied by the confidential informants, and made up for any shortcomings in terms of the underlying circumstances supporting their veracity. See Commonwealth v. Parapar, 404 Mass. 319, 322-24 (1989). The statements attributed to the informants indicate that they had been in the presence of Mr. Pena, and by inference Mr. Rios, when drugs were sold or delivered or when conversations took place about drugs which is sufficient to establish their basis of knowledge. See Commonwealth v. Montanez, 410 Mass. 290, 299 (1991); Commonwealth v. Lapine, 410 Mass. 38, 41 (1991).
8.
When the statements by the informants are considered along with the observations of the police who conducted surveillance and the three controlled purchases of drugs, it is clear that the affidavit of Officer O’Malley establishes probable cause to believe that the second floor of 30 Grand Street in Worcester was being used by Mr. Rios as a “secondary stash location to store and prepare Pena’s drugs for delivery,” as asserted in the application for a warrant. The police surveillance and investigation confirmed that the individual who drove the silver Honda and accompanied Mr. Pena on drug deliveries and acted as a drug deliverer for Mr. Pena on another occasion was Mr. Rios. This was confirmed by CI#2 who identified Mr. Rios. Police surveillance also confirmed that Mr. Rios left 30 Grand Street to make a drug delivery. It is reasonable to infer that the conversation overheard by Cl#2 on September 12th was between Mr. Pena and Mr. Rios, and that the location of the “secondary stash” for Mr. Pena was a vacant apartment at 30 Grand Street. This is buttressed by the fact that both Mr. Pena and Mr. Rios listed different locations as their residences. Further police investigation led to the discovery that the second and third floors of 30 Grand Street were vacant, but there was some evidence of minimal activity (electrical usage) on the second floor.
9. Search of the Third-floor Area
The remaining question is whether the warrant authorized the police to enter and search the third floor of 30 Grand Street. The warrant appropriately sought and obtained permission to search any storage areas associated with the second-floor apartment at 30 Grand Street. Here, Officer O’Malley’s affidavit explains that based on his training and experience, it is common for drug dealers to have “multiple stash apartments.” He also explains that often a drug dealer maintains one location for weighing and packaging and another for drug storage. See O’Malley Affidavit at page 6, para. 18. The conversation overheard by CI#2 was that 30 Grand Street was being used for both storage and packaging. When the police did not find drugs on the second floor, it was reasonable to infer that they would be found in a storage area. The defendant describes the third floor of 30 Grand Street as “the attic.” Defendant’s Memorandum of Law at 12. Whether the third floor had previously been associated with the first or second floor as an attic is not the question. Rather, the issue is whether the police were warranted in the belief that, at the time they executed the warrant, the third floor of 30 Grand Street was a storage area associated with the second floor or possibly a common storage area for both floors. The answer, I believe, is “yes.”
10.
The Defendant relies on a single case, Commonwealth v. James, 54 Mass. 726 (2002), which deals with a different question. In James, the question was whether the Commonwealth could prove beyond a reasonable doubt that the defendant, one of seven people arrested in a third-floor apartment of a three-family dwelling, had constructive possession over cocaine found in the attic. The Appeals Court concluded that a nexus between the defendant and the drugs was lacking. “Here, the attic was only accessible through the locked shed on the third-floor porch of a three-level, three-family apartment house. Nothing in the attic reasonably connected the defendant to the attic or the powder cocaine.” Id. at 729. In this case, by contrast, the issue is whether there is a nexus between *296 the second floor and the third floor, not whether the Commonwealth is able to prove that the defendant had constructive possession of the drugs. The question is whether there are reasonable grounds to believe that the third-floor attic was a common storage area for the first and second floors or at least a storage area for the second floor. Even though the entrance to the attic was not from within the second floor as in Commonwealth v. Scala, 380 Mass. 500 (1980), it was reasonable for the police to believe that the attic was a storage area for the second floor. The testimony of Officer Cortis was that he was able to enter the attic without having to unlock or open a door, but simply by going through an open door and up the stairs. See Commonwealth v. Rodriguez, 49 Mass.App.Ct. 664, 669-70 (2000).
11.
An alternative basis for denying the defendant’s motion is that the search of the third-floor attic did not affect the defendant’s privacy interests. The mere fact that the defendant has standing to assert a deprivation of his rights in circumstances such as this, see Commonwealth v. Thomas, 358 Mass. 771, 774 (1971), does not equate to evidence that he had a reasonable expectation of privacy in the location searched. See Commonwealth v. Colon, 449 Mass. 207, 213 (2007). It does not appear that the defendant owned the premises or took any reasonable steps to maintain his privacy with respect to the third floor. See Commonwealth v. Montanez, 410 Mass. 290, 301-02 (1991).
ORDER
For the above reasons, the defendant’s motion to suppress is DENIED.